**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **Case No. 1:14-cr-00591-MJG** |
| **ANGELA M. BLYTHE,** | |
| **Defendant.** | |

**AFFIDAVIT OF ANDREW C. WHITE, ANDREW G.W. NORMAN,
AND WILLIAM N. SINCLAIR IN RESPONSE TO AUGUST 25, 2017 ORDER**

Pursuant to 28 U.S.C. § 1746, Andrew C. White, Andrew G.W. Norman, and William N. Sinclair (collectively, "STSW") declare as follows:

## INTRODUCTION

1.      Before addressing the issues identified by Angela Mae Blythe in her Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 [Dckt. # 124] (the "Motion"), the undersigned declarants offer this introductory section to note that, over the course of nine months, from the time that Ms. Blythe retained the undersigned attorneys through the trial, the undersigned declarants logged many hundreds of hours interviewing witnesses, reviewing documents, and working closely and comprehensively with Ms. Blythe in person, over the phone, and via e-mail. This was not a "typical" case; the Defendant was an attorney and the stakes were high.  We had three experienced attorneys assigned to handle the case, including two very experienced former assistant United States attorneys.   Defendant also vigorously participated in trial strategy and preparation, as one would expect from an attorney with significant criminal defense experience.  Ms. Blythe personally reviewed the entire discovery produced by the Government both to save costs and also because she was intimately familiar

with the materials, most of which had been subpoenaed from her law office.   In the days leading up to the trial and throughout the entire course of the trial, Defendant was given a large conference room to use as a "war room" which contained all of the documents in the case and a computer with internet access that she used to keep track of documents, obtain relevant new ones, and conduct research as needed to prepare and handle the trial in this matter, all of which was in addition to the significant work that undersigned performed in preparation for this trial.

2.      During the period leading up to the trial, it became the consensus of the undersigned and Defendant that the best way to attack the Government's case was to show that, despite the fact that the Defendant handled the transactions set forth in the indictment, she did not possess the requisite knowledge and intent necessary to sustain a conviction.  This was to be accomplished in primary part by making the following points which, taken together, showed that the Defendant was not guilty of any of the charges in the Indictment, or which at least would raise a reasonable doubt in the minds of the jury leading them to return "not guilty" verdicts. Indeed, these defenses were discussed at length with the Defendant at a meeting with counsel on July 10, 2015, and throughout the entire period leading to the trial.  *See* September 23, 2015 E-mail from A. Norman to A. Blythe, attached hereto as **Exhibit 1**, and included in the opening statement that undersigned shared with the Defendant before the trial began, and with which she took no issue, *see* September 26, 2015 E-mail from A. White to A. Blythe, attached hereto as **Exhibit 2**):

a.      The Defendant kept, maintained, and produced to the United States Government all of her files that contained detailed documents pertaining to every Count in the Indictment.  Such conduct, it was argued, was wholly inconsistent with criminal/fraudulent intent.

2

b.    The fact that the Government waited over ten years to seek an indictment in this case and the fact that some of the evidence presented was almost 15 years old unfairly prejudiced the Defendant because several witnesses who could have been called to testify regarding matters highly relevant to the defense had died and the recollection of most of the other Government witnesses, as shown by their testimony, had faded due to the passage of time.

c.    Defendant was paid nothing more than a standard fee for the transactions mentioned in the indictment; in other words she did not share in the gains of the scheme to defraud perpetrated by Vansickle and Strosnider.  This too, it was argued, showed that the Defendant did not possess the fraudulent intent necessary to sustain the counts in the Indictment.

d.    The Defendant voluntarily submitted to interviews conducted by the Government's case agent and Government counsel, which was the antithesis of the type of behavior to be expected of someone who had been involved in a scheme to defraud.

e.    The Defendant ran a high-volume practice having represented thousands of clients and the few transactions mentioned in the Indictment were spaced far apart in time rather than days apart, and when viewed in that context, rather than the distorted, contracted timeframe presented by the Government, it was clear that Defendant had little to no reason to question anything that Vansickle or Strosnider were doing.

f.    Several other prominent Garrett County attorneys conducted real estate closings involving Vansickle, Strosnider and Vansickle's *alter ego* entities, which justified the Defendant's belief that Vansickle and Strosnider were not engaged in fraud.

g.    Contrary to the Government's assertions, Defendant substantially complied with the duties of a notary, as shown by the testimony of George Pitcher and Timothy Oursler, an attorney.

h.      Defendant was an attorney who put herself through school while raising children and had to complete seven years of higher education and pass the bar exams in Maryland and West Virginia; as such, she would not have jeopardized her livelihood by engaging in fraudulent conduct, especially when she received no part of the proceeds of the scheme.

## RESPONSE TO ISSUES IDENTIFIED IN DEFENDANT'S MOTION

**Defense Counsel Failed to Call Any Expert Witnesses to Testify About How
Real Property Conveyances Often Occur, or Other Relevant Defense Issues.**

3.      With regard to the use of expert witnesses in general, the Government did not call any experts and neither did we.  We discussed retaining experts with Ms. Blythe as early as March 2015, only a month after we were retained and approximately six months before the trial, and she told us that "she defer[red] to [STSW's] judgment on the expert."  *See* March 16, 2015 E-mail from A. Blythe to W. Sinclair, attached hereto as **Exhibit 3**.  She provided no further written guidance on this issue.

4.      Ultimately, STSW consulted with three potential experts relating to various issues in this case: Matthew D. Alegi, E. Philip Hanlon, and Patricia Hinkel, including, *inter alia*, the manner in which real estate closings should be conducted.  Indeed, as of April 6, 2015, undersigned informed Ms. Blythe that they were "moving ahead with Matt Alegi from Shulman Rogers to help on the settlement side of things" and that they would consider retaining a "bank expert."  *See* April 6, 2016 E-mail from W. Sinclair to A. Blythe, attached hereto as **Exhibit 4**. Undersigned has no record of Ms. Blythe having responded to that e-mail.  Indeed, as late as July 27, 2015, *see* E-mail from W. Sinclair to A. Blythe, attached hereto as **Exhibit 5**, undersigned and Defendant were still engaged in discussions about experts, but ultimately, the decision was jointly made by undersigned and Defendant not to obtain an expert.

4

5.      In any event, based on undersigned's consultations with the foregoing persons and our understanding of the prosecution's case, we ultimately concluded that calling an expert witness to testify about how real estate closings should be conducted, *__or indeed any of the issues__* raised in the Motion, would have allowed the Government on cross-examination to highlight the serious shortcomings of Defendant's office practices, which would have been counterproductive to the defense strategy identified above.  All of this was explained to Ms. Blythe in person at STSW's offices and she agreed with our strategy.

6.      As for "mail away" real estate settlements, it was not necessary for counsel to call a witness to explain this process.  In fact, counsel was able to elicit helpful testimony from the Government's own witness Michael Schleupner that defined "mail away" closings (See T-1-140).  Schleupner's testimony adequately explained the metes and bounds of "mail away" property closings with the result that no further evidence on this topic was needed.   But again, calling an expert to testify on this issue would have allowed the Government, through cross-examination, to highlight the many deficiencies in the client's method of conducting so-called mail away closings at issue in this case.

**Defense Counsel Failed to Call an Expert Witness to Explain What a Notary Public is, How Attorneys Routinely Rely Upon Notaries in Real Estate Transactions, and the Duties/Responsibilities of a Notary Public.**

7.      Undersigned declarants did not call an expert witness to address the above-referenced notary issues because, in our view, such testimony would have been very damaging to the Defendant.   The Government would only have needed to refer such a witness to the "*Handbook of Maryland Notaries Public,*" attached hereto as **Exhibit 6**, to illustrate the inadequacy of Defendant's practices, including that she did not keep a log of the documents she notarized and she frequently did not ask for identifying documents such as driver's licenses from

persons whose papers she was notarizing. Again, this was discussed with the Defendant as early as July 2015, and she agreed with the collective decision not to call this type of expert.

**Defense Counsel Failed to Call an Expert to Explain the Difference Between a "1031 Exchange" and a "Mortgage Payoff." The Same Expert Could Have Explained What a "1031" Exchange Is and How a "1031 Exchange" Real Estate Closing is Conducted.**

8.      There was no need to call an expert during the Defendant's case because Jodie Hughes, a Government witness employed by BB&T Bank, fully defined the elements of 1031 exchanges and the purpose of such dealings. (T-II-339 – 354). Indeed, Hughes described the Red Run transaction in such a way that made it clear that Red Run did not involve a mortgage and his testimony was thus helpful to the defense. *See id.* Regardless, STSW did speak with a potential expert about the Red Run 1031 exchange and was concerned about the numerous irregularities he identified therein. For the reasons discussed above, it was STSW's professional opinion that calling an expert on this issue would have only emphasized those irregularities and would have been counter-productive to the defense points agreed to by Ms. Blythe and identified above. Ms. Blythe was well aware of this tactical decision and she concurred with the collective decision not to call such a witness.

**Counsel Failed to Call an Expert Witness to Explain Basic Property Law.**

9.      *See generally* paragraphs 3 – 8 *supra.*

**Defense Counsel Failed to Call an Expert Witness to Explain That Land Owners Routinely and Legally Use Companies for Privacy Purposes.**

10.     As an initial matter, Defendant never mentioned hiring such an expert and, had she done so, undersigned would have explained that it would have been difficult to qualify such an expert or be allowed to offer an opinion on this issue. Regardless, undersigned counseled the client that we needed to stay away from this issue because it opened the door to Defendant's prior representation of Vansickle in a civil case in which he was accused of fraud and used

companies for real property purchases, which the Government could use to argue that Defendant had been on notice that Vansickle used companies for such purposes for improper means and thus should have been much more careful with his transactions than she otherwise was.  And in any event, the jury was shown – over Government objections – many transactions involving Vansickle and others using corporate entities for a variety of legal purposes, thus clearly making the point that Defendant now insists undersigned failed to make.

**Defense Counsel Failed to Ever Advise Defendant About Judge William D. Quarles Jr.'s September 29, 2015 Memorandum Opinion.**

11.     Defendant received every one of the Court's decisions in this case.   The Defendant was also present in court when Judge Quarles rendered the oral ruling at issue.    In any event, Defendant was an attorney admitted to practice in the U.S. District Court for the District of Maryland and thus had access to all of the rulings issued by Judge Quarles.  Equally important, the sole issue identified is Defendant's inability to present her state of mind; of course, the most preferable, if not the only, way to do so is through Defendant's own testimony. Again, Defendant had participated in numerous lengthy meetings with undersigned counsel to discuss case strategy and the burden shouldered by the Government with respect proving her intent.    In short, she was very well aware that her intent was the key issue in the case any attempt now to suggest that she was unaware of this is, frankly, disingenuous.

12.     Moreover, undersigned spent hours going back and forth with Defendant as to whether she should testify and the pros and cons attendant to that decision. *See, e.g.*, October 5, 2015 E-mail from A. White to A. Blythe, attached hereto as **Exhibit 7**.  Indeed, Mr. Norman had a 38-page outline – a work in progress – as of October 3 (well into the trial) in the event that it was ultimately decided that Defendant should testify, attached hereto as **Exhibit 8**.

13.     Ultimately, the decision not to testify was not made by the client until after the Government had rested its case – and undersigned had discussed the ruling at issue with Defendant – at which time, we all (including Defendant) agreed that there were too many risks to calling her as a witness.   These risks included the fact that the Defendant had tremendous difficulty in answering questions on mock cross-examination and under mock questioning by undersigned counsel and tended to ramble and stay unfocused when asked direct questions. Again, this was all discussed with Defendant and she understood the reasoning and concurred with the unanimous judgment of counsel.[1]   This was also put on the record in open court at p. 1264 of the trial transcript.   Finally, several of the points discussed in paragraph 2 above go to Defendant's state of mind, all of which (again) were formulated in part by the Defendant and argued at closing.

**Counsel Failed to Call an Expert to Explain the Purpose of a *Title Letter* or *Title Insurance Commitment*, and Information Contained Therein About Mortgage Payoffs, Etc.**

14.     The Government's witnesses Jeffrey Moser and F.J. Grady explained the nature and purpose of a title letter and title insurance.   Undersigned did not call anyone to elaborate further on these topics for the same reasons discussed *supra* at paragraphs 3 – 8 generally.

**Defense Counsel Failed to Call an Expert to Testify About BB&T's Negligence in Making the Stony Brook/Strosnider Red Run Loan.**

15.     BB&T's negligence was amply demonstrated to the jury through the testimony of their own employees, Jodie Hughes and Gregg Johnson, who were called during the Government's case-in-chief and which showed that the BB&T witnesses had, in many instances,

---

[1] In addition, undersigned counsel was concerned that Defendant would have tremendous anxiety if she testified, especially in light of the fact that she had failed a pre-trial polygraph administered by a former FBI Agent and which focused extensively on her knowledge and intent relevant to this case.

no idea what happened in the Red Run transaction mainly because of the passage of time or due to their own negligence.  Undersigned's questioning of these Government witnesses showed the jury just how sloppy and negligent BB&T Bank officials were in the Red Run transaction. Moreover, negligence on behalf of BB&T would not have amounted to a defense for our client and we were concerned as to how the jury would react if we called a witness in an attempt to shift the blame to BB&T for the financial loss of the Red Run transaction.

**Defense Counsel Did Not Have Exhibits Available to be Presented to the Court When Witnesses Testified.**

16.     Ms. Blythe argues that undersigned counsel was unprepared for trial in that the defense did not seek to admit three years of tax returns for prosecution witness and cooperator Louis Strosnider.  Likewise, she faults counsel for not admitting a "charge-off" summary which she claims would show "BB&T's negligence in making the loan."  It bears repeating that the defense established clearly through the cross-examination of Mr. Strosnider, S/A Umlauf, and the BB&T witnesses at trial that the bank was negligent in the handling of the Red Run transaction.  In fact, the cross-examination of these witnesses by undersigned counsel prompted Ms. Blythe on numerous occasions to complement counsel on the quality and effectiveness of the questionings, characterizing counsel as "sharks" destroying the prosecution witnesses. Additionally, the jury was aware that BB&T had charged off a good deal of the loan after the default by Mr. Strosnider.  It is not clear what value the charge off summary would have had and Ms. Blythe does not mention how exactly the admission of the summary would have had any effect on her case.  Likewise, Mr. Strosnider admitted both on direct and cross-examination to making significant false representations to BB&T to get the loan on the Red Run Lodge, including lying about his income.  He admitted that he made tremendous profits from the Red Run deal and that Ms. Blythe was not a co-conspirator with him in the deal.   After his cross-

examination, it was clear that Strosnider was a liar who received hundreds of thousands of dollars and that BB&T officials were asleep at the switch and did not take reasonable steps to verify the representations made by Strosnider and Vansickle.   But again, Ms. Blythe fails to understand that attacking BB&T's actions in the Red Run transaction was not a defense.  The question for the jury was whether she committed a fraud on BB&T in the manner in which she carried out the Red Run closing and her failure to disclose the fact that the entities involved in the transaction were alter egos of Mr. Vansickle and not truly arms-length participants.  As for Ms. Blythe's complaints about the tax returns and the impact on the closing argument by counsel, one need only look at the transcript of the closing argument to see that mentioning three tax returns of a cooperator would not have had any impact whatsoever.   In fact, Ms. Blythe complimented counsel numerous times on the effectiveness of the closing argument.

### Defense Counsel Failed to Request a Jury Instruction to Explain a Notary Public's Duties, and the Criminal Ramifications if the Notary Public Fails in Those Duties.

17.     For the same reasons discussed *supra* at paragraph 7, we did not request such an instruction.

### Defense Counsel Failed to Advise the Judge and the Jury that Jonathan Robeson, Esquire, Conducted the Tracy Riley Closing, Not Defendant.

18.     Undersigned discussed this issue with Defendant both before and during the trial and everyone, including Defendant, agreed that it was best as a matter of strategy not to make clear for the jury the fact that Mr. Robeson conducted the Tracy Riley closing.  *See* October 13, 2015 E-mail from A. White to A. Blythe, attached hereto as **Exhibit 9**.

### Defense Counsel's Comments and Behavior in Front of the Jury Prejudiced Defendant's Defense.

19.     This wholly speculative issue cannot be responded to factually as required in a declaration of this sort.  That undersigned do not offer a substantive response, however, does not

10

mean that they do agree with the conclusory argument offered by the Defendant here.  To the contrary, all the undersigned declarants comported themselves in a professional manner throughout the entirety of the trial.

### Defense Counsel Was Unprepared to Cross-Examine Key Witnesses.

20.     In a trial that spanned almost two weeks and involved some 21 witnesses, Defendant identifies one witness – Gregg Johnson – who Mr. Norman was supposedly unprepared to cross-examine.  Of course, Defendant fails to offer any factual assertion or transcript page to identify how in fact that cross-examination was ineffective, instead offering the red herring that because Mr. White suggested that Mr. Norman might be nervous, in fact, Mr. Norma was ineffective on cross.  And she further fails to explain how, even if that one cross-examination was ineffective, it so tainted the case as to prejudice her.  Incredibly, she suggests that all three lawyers should have been prepared to cross-examine every witness, which would have trebled her costs, when she admits that she has failed to pay undersigned all that she owes them.  In any event, the cross-examination of Government witnesses in this case was, without exception, effective and the product of hundreds of hours of preparation between the undersigned and Defendant.  We were able to elicit damaging admissions and evidence that buttressed the aforementioned goals of the defense.  Indeed, the effectiveness of the cross-examination was demonstrated by the fact that the jury deliberated for almost three days in a case involving four substantive counts and at least two jurors were in tears when the verdict was issued.

### Defense Counsel Did Not Ask for Witnesses to be Sequestered at the Beginning of the Trial, Failed to File Post-Conviction Motions, and Failed to Subpoena the Bank Files, All of Which Prejudiced Defendant's Case.

21.     First, F.R.E. 615(b) permits the Government's case agent, Special Agent Umlauf, to be present in the Courtroom throughout the trial.  Second, other than S/A Umlauf, counsel

does not recall any other Government witnesses in the Courtroom to hear the testimony of others. Notably, the Motion does not identify any such witnesses.  With respect to the complaint about bank files, many of the files were not obtainable due to the large passage of time, something that undersigned discussed with the Defendant.  Indeed, the Government relied almost exclusively on the files taken from the client's law office in prosecuting this case.  No post-trial motions were filed because the client did not ask us to do so, and obviously, we cannot simply file such a motion of our own accord, and indeed, and in any event, Defendant essentially withdrew from communicating with undersigned after the trial, and when she did so, it was to re-raise issues that had already been addressed and not to identify what could be done after the fact.  Finally, we were not aware of any motions that could have been filed that might have been meritorious.  This is borne out by the fact that the Fourth Circuit affirmed the verdict in all respects.

> **Defense Counsel Failed to Cross-Examine Summer Rhodes, the Notary Public the Government Called in Its Case in Chief.  Defense Counsel Failed to Call as a Defense Witness Another Notary Public Who Was Used in Vansickle's Scheme.**

22.     Ms. Spiker's direct testimony amply showed that she improperly notarized documents presented to her by Strosnider and Vansickle; as such, and because she was highly emotional on the stand, undersigned was concerned about her breaking down on cross examination and the same being held against Defendant, and thus made the call after the Government concluded its direct examination of Ms. Spiker not to cross-examine her.  Indeed, Mr. White argued that very point in his closing, which he shared in advance with Defendant, who approved the same. *See, e.g.*, October 4, 2015 E-mail from A. Blythe to A. White, attached hereto as **Exhibit 10**.  Moreover, undersigned discussed the possibility with Defendant long in advance of trial that they might not need testimony from her and Defendant understood and accepted that advice. *See, e.g.*, August 18, 2015 E-mail from A. Norman to A. Blythe, attached

hereto as **Exhibit 11**.   And with regard to the other witness (Wendy Herron, now Kelly), undersigned located her in Pennsylvania and utilized a private investigator to interview her. Based on that interview and one later conducted by declarant Norman, it was decided that it would be too risky to put Ms. Herron on the stand because her recollection of the events in question was understandably faulty due to the passage of time.   This was discussed during preparatory meetings held on Thursday, September 24 and Friday, September 25 at undersigned's offices with Defendant and she fully concurred in the decision.

### Defense Counsel Failed to Call Samuel Vansickle as a Defense Witness or to Present Vansickle's Apology Letter.

23.    As the Defendant knows, before trial, counsel wrote to Elizabeth Oyer, Esq., Vansickle's attorney, seeking permission to interview her client and asking if she would accept service of a trial subpoena. *See* September 5, 2015 E-mail from A. Norman to E. Oyer, attached hereto as **Exhibit 12**.  Ms. Oyer later spoke to Mr. White and refused to give him permission to interview Mr. Vansickle.  As a result, undersigned chose not to call Vansickle as to have done so without knowing what he would say would have been a classic example of ineffective assistance of counsel.  As for introducing Vansickle's apology letter, it was inadmissible hearsay and not relevant to any issue in the case.   Moreover, it was written by a man whose attorney was, at the time, claiming that he was incompetent to stand trial.   Again, all of this was discussed with Defendant, who agreed to it.

### Defense Counsel Failed to Properly Cross-Examine the Susquehanna Bank President, Jeff McCauley, Because Defense Counsel Was Unprepared.

24.    This witness was cross-examined effectively.   We were able to have him admit many key facts helpful to the defense.  It was also not relevant that Susquehanna had business dealings with Vansickle years after the charged acts in this case.  We possessed no information

that Mr. McCauley had any reason to question the *bona fides* of the dealings with Mr. Vansickle in the three-plus years following the end of the conspiracy charged in this case.

### Defense Counsel Failed to Explain to the Jury Why the Defense "Shoved" More Than 300 Deeds Into Evidence.

25.     In fact, counsel addressed this issue during its cross-examination of S/A Umlauf, the Government's case agent and during its closing argument where it pointedly noted that the multiple real estate conveyancing documents obtained from the Garrett County Circuit Court showed that other attorneys had represented both Vansickle and entities the Government claimed to be his aliases and importantly that Umlauf and the prosecution team had ignored this during its investigation and its case at trial.  (T-VI-1357, 1360).   The purpose of introducing documents from so many real property conveyances – over Government objection – was to show to the jury that the Defendant was justified in feeling comfortable in dealing with Vansickle and Strosnider and the entities the Government claimed were bogus because other prominent local attorneys were doing the same thing at the same time (again, a point discussed *supra* that Defendant agreed should be part of the defense focus in this case).   In addition, these documents were introduced to show that the Government had studiously ignored the transactions because they were inconsistent with its narrative that Blythe had conspired with Vansickle and Strosnider to commit fraud.

### Defense Counsel Failed to Show the Jury that Vansickle Conducted Business With More Lawyers and Companies Than Just Defendant.

26.     This statement is incorrect – the Defendant's secretary, Carol Corbin, was called to introduce numerous records of real estate transactions involving Vansickle and/or his aliases that were handled by other attorneys, such as Craig Ingram and Linda Sherbin.  (T-VI-1204 – 1239).

### Defense Counsel Failed to Call Numerous Key Witnesses.

27.     Linda Sherbin was not called because defense counsel Norman spoke with her over the phone in the summer of 2015 and determined that calling her as a witness would have been detrimental because she was hostile and provided no information that would have been helpful.  Moreover, we discussed this specific issue with the client on September 23, 2015, and she concurred that Ms. Sherbin would not be called as a defense witness and was thereafter excused.  *See* September 23, 2015 E-mail from A. Norman to P. Kelly, attached hereto as **Exhibit 13**.  With regard to Craig Ingram, Mr. Norman met with and spoke to him about testifying and ultimately, undersigned were concerned because Mr. Ingram had sent a facsimile to Defendant during the time in question about the propriety of one of the transactions at issue to which Defendant never responded.  For that reason and others, on October 1, 2015, Mr. Norman and Mr. White discussed calling Mr. Ingram with Defendant and it was agreed that they should not do so.  *See* October 2, 2015 E-mail from A. Norman to W. Sinclair, attached hereto as **Exhibit 14**.  With regard to Jonathan Robeson, he was called as a prosecution witness and effectively cross-examined and thus there was no need to call him as a defense witness.  Moreover, we spent numerous days discussing trial strategy and potential defense witnesses with the client.  She was an active participant in her own defense and we do not recall her *ever* asking us to subpoena Mr. Snodgrass or Ms. Oliver as witnesses.   Additionally, testimony that they "trusted" Vansickle would not have been admissible under any circumstance.

### Defendant Did Not Knowingly Waive Her Right to Testify.

28.     *See supra*, paragraphs 12 and 13.

**Defense Counsel Did Not Even Know How to Use the Court's Desktop Projector.**

29.     Another wholly speculative (and, frankly, silly) issue that cannot be adequately responded to factually as required in a declaration of this sort.  Nonetheless, Mr. Sinclair offered the comment at issue in jest (which should be obvious) and in fact received a laugh from the jury.  Generally it is accepted among trial lawyers that breaking the tension in the courtroom from time to time to gain the jury's favor is a good thing.

**Defense Counsel Failed to Show How Two Other Lawyers, Craig Ingram, Esquire and Linda Sherbin, Esquire Conducted Closings With One of Vansickle's Aliases the Same Way Defendant Conducted the Closing.**

30.     The Defendant is incorrect about this – Defense counsel, over the objection of the Government, argued it should be allowed to introduce numerous real estate conveyancing files that showed attorneys such as Craig Ingram and Linda Sherbin had conducted closings involving Vansickle and/or various entities that the Government contended were Vansickle's *alter egos*. There was protracted legal argument on this subject between counsel for the parties before the Court eventually ruled in favor of the Defendant and permitted the introduction of this evidence. (T-VI-1124 – 1139).  The Defendant's secretary, Carol Corbin, was thereafter called to introduce numerous records of real estate transaction involving Vansickle and/or his aliases that were handled by other attorneys, such as Mr. Ingram and Ms. Sherbin.  (T-VI-1204 – 1239). Moreover, as discussed *supra*, Defendant agreed with undersigned that neither Mr. Ingram nor Ms. Sherbin should be called as witnesses, thus preventing a very obvious route by which this evidence could be introduced at trial.

**Defense Counsel Failed to Present or Explain the Law About: (1) Attorney Certification on Deeds, (2) the Notary Public's Purpose and Duties, (3) 1031 Exchanges, (4) IRS 1099 Filings Which Attorneys Are Required to File With the IRS to Report Real Property Conveyances, (5) Maryland Real Property Intake Sheets, and (6) Conveyance Types Identified on Maryland Real Property Intake Sheets.**

31.     All of these issues have been discussed above.

**Defense Counsel Failed to Provide Defendant With the Pre-Sentence Investigation Report Until December 1, 2015. Defendant's Sentencing was December 14, 2015.**

32.     It is not clear how this random complaint has any relevance to the Defendant's conviction. Be that as it may, we note that the pre-sentence report ("PSR") was submitted by U.S. Probation to Judge Quarles on December 7 and contained all financial information for the defendant. This information persuaded the Court to forego imposing a fine – see para. 65 of the PSR. Undersigned also submitted a thorough and comprehensive sentencing memorandum to the Court, which was very carefully reviewed and approved by the client. Notwithstanding the probation officer's recommendation that the client receive a sentence of **46 months**, the Court was very obviously persuaded by undersigned's effective advocacy, as the client received a tremendously-reduced sentence of 12 months plus one day, resulting in her serving for less than a full year in prison.

Executed on this 1st day of December, 2017 as follows:

| | |
|---|---|
| _/s/_ | _/s/_ |
| By: Andrew G.W. Norman, as to all paragraphs save 4, 5 and 10 | By: Andrew C. White, as to all paragraphs |

_/s/_
By: William N. Sinclair, as to all paragraphs save 10, 21 and 32