## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | Criminal No. <u>MJG-14-0591</u> |
| | : | Civil No. <u>MJG-17-1756</u> |
| **ANGELA M. BLYTHE,** | : | |
| **Defendant/Petitioner.** | : | |

oooOoooo

## GOVERNMENT'S RESPONSE TO PETITIONER/DEFENDANT'S MOTION
## <u>TO VACATE, SET ASIDE or CORRECT A SENTENCE UNDER 28 U.S.C. §2255</u>

The United States of America, through undersigned counsel, respectfully submits the following response in opposition to Petitioner's Motion to Vacate, Set Aside, or Correct a Sentence pursuant to 28 U.S.C. § 2255. ECF 124-3. The Motion raises no meritorious issues and should be denied without an evidentiary hearing.

I. **<u>Procedural Background</u>**

In 2014, the defendant Angela Blythe ("Blythe" or "the defendant") was an attorney in Garrett County, Maryland. She was charged in a four-count Indictment with conspiring with Samuel VanSickle to commit bank fraud, in violation of 18 U.S.C. § 1349 (Count One); with a substantive bank fraud charge for defrauding BB&T Bank, in violation of 18 U.S.C. § 1344 (Count Two); and with making false statements to BB&T and United Bank and Trust, in violation of 18 U.S.C. § 1014 (Counts Three and Four), all in connection with real estate settlements involving bank loans that she closed for a fictitious person and entity: "Donald Blunt, Trustee for Gospel Church" or "Donald Blunt, Trustee for Freedom Church." Blythe was initially represented by Robert Bonsib, but he struck his appearance, ECF 15; thereafter, Blythe was represented by retained counsel Silverman, Thompson, & White, namely Andrew C. White, William Sinclair, and Andrew G.W. Norman (hereafter "defense counsel"). ECF 6, 7, 19. After

1

discovery and the resolution of a number of pretrial motions, the jury trial began in Baltimore on

September 28, 2015, and the jury returned guilty verdicts on all counts on October 9, 2015.  On

December 16, 2015, the district court sentenced Blythe to a downward variant sentence of four

concurrent terms of imprisonment of a year and a day, along with restitution, forfeiture, and three

years of supervised release.  Blythe appealed and had appointed counsel, Shearman & Sterling,

LLP, for the appeal.  The Fourth Circuit affirmed all of Blythe's convictions in an unpublished

per curiam opinion.  Appeal No 15-4799 (July 13, 2016).

On June 26, 2017, Blythe filed this pro se petition pursuant to 28 U.S.C. § 2255.  ECF

124.  On June 28, 2017, this Court ordered the government to respond. ECF 125. On the

government's motion, the Court ordered Blythe's defense attorneys to provide the government

with an Affidavit addressing Blythe's complaints regarding their work.  ECF 127.  The Court

also ordered defense counsel to serve a copy of the Affidavit on Blythe. ECF 131.   On

December 1, 2017, defense counsel served its Affidavit on the government and on its former

client.  ECF 134.  The Affidavit has now been filed as ECF 137 and the sealed exhibits are ECF

139.

II.      **Factual Background**

**A.  Evidence Introduced at Trial**

**Responsibilities of a Settlement Attorney and Insurance Agent**

Blythe was an attorney admitted to practice in Maryland and West Virginia. In February

2000, she became, through Troese TriState Title, an insurance agent for Chicago Title Insurance

Company.  A retired Chicago Title executive who had dealt with Blythe during his tenure

testified about her responsibilities.  A settlement attorney such as Blythe is licensed both as an

attorney and as an insurance agent.  Chicago Title required Blythe to keep "in a separate account

funds received by her as the Agent from any source in connection with a transaction and *disburse the funds only for the purposes for which they were received*" (emphasis added).  Blythe's authority was limited to transactions below $1 million unless she had obtained prior written approval for the higher amount from Chicago Title.  As part of her duties, Blythe created the settlement statement (or Form HUD-1) that memorialized the financial transaction for the settlement Blythe was conducting, and as the settlement officer, Blythe was required to follow it. In settling property transactions, the financial institutions making the loans and their loan officers considered Blythe to be their agent.  The defendant was well aware of her obligations as a settlement attorney to conduct the financial transaction in accordance with the settlement statement, as she testified in a civil deposition.  When Blythe signed each settlement statement, she affirmed that:

> The HUD-1 settlement statement which I prepared is a true and accurate account of this transaction.  I have caused or will cause the funds to be disbursed in accordance with this statement.

Chicago Title required Blythe as its agent to verify the identities of the buyer and seller at settlement.  Blythe issued the title insurance commitment binder prior to settlement, and sent it to the lender.  On each title insurance binder, typically Item 4 on Schedule B, Blythe stated that she would "verify the identity of all parties at closing."  She also set out on each title commitment binder which parties, if any, had prior liens on the property.  The title commitment binder reflected Blythe's obligation to insure that these liens were satisfied before title could vest in the new buyer, and before the new lender's mortgage could be filed to secure the lender in first position.

### Overview of the Scheme to Defraud

"Donald Blunt, Trustee for Gospel Church" or "Donald Blunt, Trustee for Freedom Church" was the seller in seven settlements that Blythe handled.[1]  The chain of title for five of the properties showed that Samuel VanSickle had transferred the property for zero (or minimal) consideration to "Donald Blunt, Gospel Church" or "Donald Blunt, Freedom Church."    The chain of title for other properties showed a transfer from Sisler Lumber to Donald Blunt, Trustee for Freedom Church or Gospel Church.  Blythe examined the chain of title as part of her duties as the settlement agent. Blythe was aware that VanSickle and Sisler Lumber had previously been sued by the State of Maryland in a civil action.  Although Chicago Title required the defendant to verify the identities of all parties to a real estate settlement, and even though Blythe stated in the title commitment binders to the lenders that she would "verify the identity of all parties," Blythe admitted in a civil deposition that she did not know who Donald Blunt was and had "not met Donald Blunt.  I think I was clear about that before."  Her deposition, in pertinent part, was read to the jury.  The identity of the seller (or lack thereof) was a material fact for the lenders. Blythe's failure to meet Blunt or to obtain his identification could not be excused as sloppiness. Indeed, when Blythe conducted a settlement for VanSickle to sell property in his own name to a third party, she included driver's license photographs of all parties—sellers and buyers—in the settlement file.  For the settlements of both the Rileys and Schamburgs (two of the transactions at issue in this case), Blythe obtained the buyers' identification but failed to require identification for "Blunt"—whom, as she testified in the civil deposition, she had never met and did not know who he was.

---

[1] The government also introduced evidence of an eighth settlement that the defendant conducted for another VanSickle alias, "Jacob Aiken."  "Aiken" also turned up in the seven "Donald Blunt" settlements as an officer at "Unity Mortgage."

"Donald Blunt" had no driver's license or voter registration in either Maryland or West Virginia.  For some settlements, he was purported to be the trustee for Gospel Church; for others, he was the trustee for Freedom Church; and for the Schamburgs' settlement, both Gospel Church and Freedom Church were named in Blythe's settlement file.  There is neither a Freedom Church nor a Gospel Church in either Maryland or West Virginia.   No one had ever met Donald Blunt, including Blythe.  Nothing in her files showed a date of birth for Blunt.  And while she did have a Social Security number for Blunt, the Internal Revenue Service lacked any records for that name and number.

Blythe knew that Post Office Box 156 in Accident, Maryland was Van Sickle's address. VanSickle testified in Blythe's presence at his deposition that that was his address, and Blythe used that address as VanSickle's address on her law firm billing records.  Blythe at times used VanSickle's post office box address for Gospel Church.  In one transaction, Blythe's office sent correspondence for VanSickle as buyer and for Gospel Church as seller, both to the same address.  On other settlements when VanSickle and Gospel Church were parties, Blythe used Post Office 156, Accident, Maryland for VanSickle and moved Gospel Church to the same address as Stony Brook Property, 56017 Garrett Highway, McHenry, Maryland.  Stony Brook Property was a real estate brokerage firm which was owned by Louis Strosnider, a VanSickle co-conspirator, who had pled guilty to bank fraud conspiracy, cooperated with the government, and testified at trial.  Blythe was aware of Stony Brook's location on Garrett Highway: she handled the settlement when a bank loaned Strosnider almost $1 million to buy land in West Virginia from "Donald Blunt, Freedom Church"; the security for that $1 million loan included the Stony Brook property to secure the bank loan, which Strosnider had recently acquired from "Donald Blunt, Gospel Church."

Blythe was issued a trial subpoena for her billing records for Strosnider, for his companies, and for VanSickle and all of the latter's aliases—Donald Blunt,  Gospel Church, Allen (or Allan) Helms, Unity Mortgage, Equity Lenders, and Jacob Aiken.  Blythe showed Post Office Box 156, Accident, Maryland on VanSickle's billing records and 26017 Garrett Highway for Strosnider's businesses.  She never issued a single bill to any of VanSickle's aliases.

Blythe was such an integral part of VanSickle's scheme that when Donald Blunt/Gospel Church sold property to a third party, the real estate contracts required that Blythe be the closer for the transaction.  When VanSickle used his own identity to purchase property from his alter ego Donald Blunt (financing the purchase with a bank), no condition in the contract requiring use of Blythe was necessary because the buyer (VanSickle) traditionally chooses the closing agent.

In transactions in which "Donald Blunt, Trustee for Gospel Church" or "Freedom Church" sold property, one would have expected Blythe to pay over the settlement proceeds to the seller.  But Blythe instead paid the settlement proceeds to Unity Mortgage.  For several transactions, shortly before closing, Blythe or VanSickle filed a new mortgage in favor of Unity Mortgage on the property to be sold, which resulted in Blythe paying the settlement proceeds to that new mortgage holder.  "Unity Mortgage" was not a mortgage company, was not incorporated, and was not even listed as a trade name for VanSickle.  Instead, "Unity Mortgage" was identified on VanSickle's bank account as a "sole proprietorship."  VanSickle directed Blythe to provide the "Unity Mortgage" checks to him.

When "Unity Mortgage" was required to release its mortgage in connection with the settlement, "Jacob Aiken" was typically used as the officer, although sometimes Allen (or Allan) Helms was used, instead.  Neither "Aiken" nor Helms existed, but Blythe falsely signed as a witness to the releases of both Aiken and Allen Helms in connection with Gospel Church's sale

of The Woodlands to VanSickle for $4 million.  Blythe admitted in a civil deposition that she did not know Helms.

For two transactions, Blythe paid the settlement proceeds to "Unity Mortgage" at VanSickle's direction even though the properties had no mortgage on them at all.  Blythe had no instruction in her settlement file from Blunt as Trustee for the Church (the seller) to authorize payment of the proceeds to Unity Mortgage.  Blythe did, however, have instructions from VanSickle in her settlement files.      Blythe took notes on yellow legal pads that she filed in the relevant settlement files.  The notes for Red Run state that she should pay Unity Mortgage.  In addition, VanSickle left a telephone message to the same effect.   Blythe paid the sales proceeds to Unity Mortgage as directed by VanSickle.

Blythe handled the proceeds from Gospel Church's sale of property to the Schamburgs in the same way. VanSickle directed that the proceeds go to Unity Mortgage, even though there was no mortgage on the property.  Blythe had no authorization from Donald Blunt or Gospel Church to pay Unity Mortgage.

### Individual Transactions

With this background on the scheme to defraud financial institutions, it is useful to review the seven transactions specifically alleged in the conspiracy count and substantive counts. Some of the properties have a history with VanSickle and Blythe which provided proof of her guilty knowledge.

### Blythe closed the sale by "Jacob Aiken" to VanSickle of Property in West Virginia Financed by a Bank.

On October 27, 2000, Blythe conducted a settlement for "Jacob Aiken", a VanSickle alias, to sell West Virginia property to Sam VanSickle who used a loan from AgChoice for $380,000.  "Aiken" took title to the property in June 2000 from Sisler Lumber.  Sisler Lumber

7

and VanSickle had previously been sued together by the State of Maryland, as VanSickle had

testified, and as Blythe had heard, in a civil deposition defended by Blythe.   In August 2000,

Blythe prepared and filed a 30 year mortgage on the property, signed by "Aiken," in favor of

Equity Lenders, P.O. Box 156, Accident, Maryland—VanSickle's address.    In October 2000,

"Aiken" then sold the property to VanSickle with a loan from AgChoice Farm Credit.  Blythe

paid the sales proceeds of $357,000 to Equity Lenders based on the new mortgage.  Blythe's

notes in the file show that VanSickle explained this transaction to her on September 15, 2000.

Blythe drafted the **30 year** mortgage approximately **6-7 weeks** before the closing on the

AgChoice loan to VanSickle for the purchase of the property from Aiken.  The AgChoice loan

officer could not think of a valid business reason for the 30 year mortgage so close in time to the

sale of the property.  The jury could fairly conclude that the 30 year mortgage was a fake

transaction to justify paying the sales proceeds to "Equity Lenders" instead of "Aiken."  The

AgChoice loan officer testified at trial that it "absolutely" would have mattered to him if the

buyer and seller had the same identity.  He explained that as a loan officer, having willing buyers

and sellers who are engaging in an arm's length transaction is what he expects.  He also expected

that the settlement officer at the closing (Blythe), would have identified the parties.

**Blythe Closed the Sale by Donald Blunt, Trustee for Freedom Church, of 149 Acres in Preston County, West Virginia to Lou Strosnider/Stony Brook for $1 Million with Bank Financing.**

On March 15, 2002,  Blythe handled the settlement for "Donald Blunt, Trustee for

Freedom Church" to sell 149 acres in Preston County, West Virginia to Lou Strosnider/Stony

Brook for $1 million with a loan of $953,066 from Farm Credit of the Virginias.  Donald

Blunt/Freedom Church had acquired the land from Sisler Lumber five months earlier for

$20,000.  Blythe prepared a deed of trust by "Donald Blunt Trustee for Freedom Church" on the

West Virginia property for the benefit of "Unity Mortgage" for $1 million which she caused to

be filed in the Preston Count land records on March 12, 2002—**3 days** prior to settlement. This fake mortgage enabled her to pay the proceeds of the sale, $944,979.00, not to the seller, Gospel Church, but rather to Unity Mortgage.  "Jacob Aiken" signed the release of the $1 million mortgage on March 18, 2002.  Thus the $1 million mortgage for "Unity Mortgage" was on the property for a total of **six days.**

Strosnider provided collateral to Farm Credit of the Virginias of three parcels including (1) the Preston County land, (2) an A frame house on Deep Creek Lake, and (3) a log commercial property on Garrett Highway used by Stony Brook as its office.  These latter two properties were also the subject of suspicious transactions.  "Donald Blunt, Trustee for Gospel Church" transferred the Stony Brook office to Strosnider for $100 in September 2001, although the deed wasn't filed until February 2002.  A similar transaction occurred for the A-frame, only the transferor was Mr. and Mrs. Wilson.  The recited consideration for the A frame house on the Deep Creek Lake and the commercial office building were far too low for these transfers to be arms-length transactions, as Blythe would have known. The deeds for both the Stony Brook and A-frame transfers were prepared by "Robert Staton, Attorney", who Strosnider knew was not a Garrett County attorney and realized was an alias for VanSickle.  Blythe would also have realized that "Robert Staton" was not a Garrett County attorney, as the local bar in Garrett County is very small.   These two deeds were not filed in the land records until February 20, 2002—shortly before the closing on March 15, 2002.   Strosnider realized that VanSickle was Gospel Church and Freedom Church.  When Strosnider asked Vansickle if he were "Donald Blunt", VanSickle refused to answer.

From this transaction, Strosnider gained a home, the A frame on Deep Creek Lake, and an office building for his business. VanSickle received the sales proceeds of nearly $1 million. And Farm Credit of the Virginias received a loan that went bad.

**Blythe Closed the Sale by Donald Blunt, Trustee for Gospel Church, of 112 Acres on Old Morgantown Road in Garrett County to Vansickle With Bank Financing.**

In April 2001, VanSickle gathered together nine parcels of land that he owned and transferred all of them for $100 consideration to Gospel Church.  On October 30, 2002, Gospel Church sold one of those nine parcels back to VanSickle for $250,000 with a loan of $190,000 from AgChoice Farm Credit in a settlement handled by Blythe.  Gospel Church owned the property free and clear without any mortgages until shortly before the closing when Donald Blunt, Trustee for Gospel Church signed a $5 million indemnity mortgage pledging all nine parcels to secure repayment by "Allen Helms" to Unity Mortgage of funds loaned by Unity. There is no explanation of a relationship among Donald Blunt, Gospel Church, Allen Helms, and Unity Mortgage which would explain why the church provided collateral for Allen Helms.  The $5 million mortgage was filed in the land records on October 16, 2002—**two weeks** before settlement.  Blythe paid over the proceeds to Unity Mortgage and "Jacob Aiken" signed the mortgage release on behalf of Unity Mortgage as witnessed by "Allen Helms."  Blythe did not require Aiken either to be present for the settlement or to provide identification; the loan officer cared whether his borrower and his seller were in fact, the same party. VanSickle applied for and received a $250,000 loan from AgChoice Farm Credit to, in essence, use his true identity to purchase the property from himself using the Donald Blunt, Gospel Church identity.  If the buyer and seller were the same party, it would throw up a red flag for the loan officer.  As before, the mortgage just before settlement made no economic sense—it only served to direct the proceeds to VanSickle.

**Blythe Closed the Sale by Donald Blunt, Trustee of Gospel Church, of "The Woodlands" to VanSickle for $4 million with Bank Financing.**

Samuel VanSickle through his alias Donald Blunt, Trustee, Gospel Church, sold to himself as buyer, land on Deep Creek Lake called "The Woodlands" for a stated purchase price of $4 million.  VanSickle had explained the transaction to Blythe on June 11, 2003, as shown on Blythe's handwritten notes. Blythe identified the seller in quotes as "Gospel Church" and specifically stated, "Gospel Church to pay all closing costs," and to "pay all fees from check from Jeff" [the bank loan officer.]  The lender had received a title commitment binder from Blythe in which she listed among closing requirements "proof of identity, legal age, competency and marital status."  The settlement statement showed that Vansickle had made a down payment of $2 million and was borrowing a further $2 million to complete the transaction.  If Donald Blunt were an alter ego for VanSickle, that fact "would have mattered a lot" to the loan officer. If Van Sickle were both the buyer and the seller on this transaction, the stated down payment was "fictional," and there was no equity of $2 million in the deal.  Moreover, if VanSickle were buyer and seller, the stated purpose of the loan, to buy the land, was false.  If VanSickle already owned the property through an alter ego, the $2 million loan was not used for the intended purpose.  Also, if there were an identity between the buyer and seller, the purported value of the property of $4 million might not be real.   According to the bank loan officer, the bank loaned money on a transaction that wasn't real.

Blythe handled the settlement for The Woodlands on June 30, 2003 and July 1, 2003.  In October 2002, as discussed above in connection with the Old Morgantown Road transaction, VanSickle had filed a mortgage on nine parcels for $5 million in which Gospel Church agreed to pledge its property to secure a loan from Unity Mortgage to Allen Helms.  "The Woodlands" was one of the nine properties, and Blythe identified the Unity Mortgage lien and three "Equity

11

Lenders" mortgages as having to be released for title to "the Woodlands" to vest in the new buyer (VanSickle) and the new lender (bank).  In connection with the settlement, Blythe signed as a witness and notarized mortgage releases by two non-existent persons, namely Jacob Aiken on behalf of Unity Mortgage and Allen Helms on behalf of Equity Lenders.  Blythe delivered the proceeds of this transaction, a $1.9 million check, to VanSickle, the buyer, who deposited it into his Unity Mortgage account.  As Blythe handled the transaction, she delivered the seller's proceeds to the buyer.

For the Woodlands settlement, all the settlement costs were required to be paid by Gospel Church according to instructions VanSickle provided to Blythe, which she reflected in the settlement statement. If excess settlement costs needed to be refunded, the payments should have gone to Gospel Church.    However, Blythe directed that the payments go to VanSickle. Blythe's paralegal had made the refund checks payable to "Gospel Church," but the paralegal overwrote "Gospel Church" on the refund checks with VanSickle's name and placed the initials "AB" for "Angela Blythe" beside "VanSickle" to signify the defendant's instructions. The paralegal testified that she would not have refunded the monies to VanSickle, instead of Gospel Church, without direction from the defendant.

**Blythe Closed the Sale from Donald Blunt, Gospel Church, of Red Run Inn on Deep Creek Lake, to Louis Strosnider for $2.725 million with Bank Financing.**

"Donald Blunt, Gospel Church," contracted with Louis Strosnider to sell Red Run, a bar/restaurant/bed and breakfast on a 3.5 acre lot on Deep Creek Lake, for $3 million. The contract provided that the settlement would occur at the office of Angela Blythe.  Strosnider had told VanSickle, who controlled Red Run, that he (Strosnider) would appreciate an opportunity to buy it.  Strosnider borrowed the funds for the purchase from BB&T.  The original BB&T loan commitment was for $2 million, but that commitment required that Red Run appraise for $2.5

million or more and required a mortgage on Red Run to secure the loan plus additional collateral of $150,000.   When Red Run did not appraise as high as expected, the purchase price of $3 million was lowered to $2,725,000, and the loan amount was lowered from $2 million to $1,750,000.  $1,750 million was the maximum amount BB&T would loan given the Red Run appraisal.  Blythe prepared a settlement statement which showed that Strosnider had to bring buyer's funds to close of $331,894.50.  The BB&T loan officer asked Blythe to re-do the settlement statement to include property taxes and appraisal fees.  The second version of the settlement statement raised the buyer's funds needed to close to $341,379.94.  Strosnider testified that he didn't have the funds, and that Blythe at settlement never asked him for the funds.  Strosnider testified that when he asked VanSickle about the buyer's funds to close, VanSickle said, "It's been taken care of."  VanSickle had spoken to Blythe—a fact confirmed by Blythe's handwritten notes of her conversation with VanSickle.  The bank officials –the loan officer and his supervisor—stated that the buyer's funds to close was a material term in the transaction to the bank/lender and that the bank expected the settlement attorney to comply with the HUD-1.   Moreover, the title commitment binder Blythe sent to BB&T provided that she would verify the identity of the parties, which she also failed to do.  Blythe never disclosed to BB&T that she had failed to collect the $341,379.94 but instead signed the HUD-1, which was false in four places:  the purchase price, the amount of the sales proceeds, the identity of the seller, and the amount collected from the buyer at closing.

Blythe had a letter in her settlement file from Jacob Aiken—one of VanSickle's aliases—authorizing her to pay Unity Mortgage (also a VanSickle alias) $1.6 million in sales proceeds instead of $1.9 million, as stated on the HUD-1.  Aside from the fact that this letter is from a fictitious person, the letter does not address the fact that all the sales proceeds belong to the

seller, Gospel Church.  In fact, there was no mortgage on the property, and Blythe had no basis

for paying Unity Mortgage, other than instructions from VanSickle, who is not named in the

transaction.   Blythe owed a fiduciary duty to the lender, and its instructions are found on the

settlement statement.  Blythe ignored the lender's instructions in favor of doing the bidding of

VanSickle—whom she knew to be the real party in interest on Red Run.

Blythe was aware that VanSickle was the real party in interest on Red Run because she

had previously handled two other Red Run transfers:  the sale of the Red Run property from

McComas Beach, LLC, to R&R Lakeside, owned by VanSickle's cousin, William Byrne.  When

the operation of Red Run did not work out, Byrne complained to VanSickle who transferred him

to work at another VanSickle property.    VanSickle showed up one day at Byrne's new job with

paperwork and had Byrne sign to transfer Red Run from R&R Lakeside to Gospel Church.

Blythe had drafted the deed which transferred Red Run to Gospel Church; the deed recited the

fact that there was no consideration.  Blythe considered VanSickle to be in charge of Red Run--

proved by Blythe's billing VanSickle preparing and for filing the release of indebtedness on Red

Run and the deed to Gospel Church.

**Blythe closed the sale by Gospel Church and/or Freedom Church of property to the Schamburgs.**

The Schamburgs' purchase of land from Gospel Church/Freedom Church was closed by

Blythe on December 2, 2004.   Mr. Schamburg testified that he never dealt with anyone from the

church but only VanSickle. Although no loan was made to the Schamburgs from a financial

institution, the Schamburgs obtained title insurance through Blythe from Chicago Title. The

property was actually in the name of "Donald Blunt, Freedom Church."  Nevertheless, "Donald

Blunt, Gospel Church" was shown on the HUD-1 settlement statement.  The Schamburgs'

closing followed the exact pattern as the Red Run closing.  VanSickle left a telephone message

on October 28, 2004 for Blythe:  "Net proceeds to be issued to 'Unity Mortgage'—same as Strosnider from Gospel Church."  Unity Mortgage had no mortgage on the Schamburgs' property, just as it had no mortgage on Red Run, and the proceeds should have gone to the seller, Gospel Church.  But Blythe again did what VanSickle told her to do, even though he was not even listed as a party to the transaction.   On December 6, 2004, four days after the closing, a member of Blythe's staff wrote, "Left vm [voice message] for Sam V to pick up check." The seller's proceeds which should have been paid over to Gospel Church or Freedom Church were diverted to Unity Mortgage, and VanSickle picked up the check.

**Blythe closed the sale from Gospel Church to the Rileys with Bank Financing.**

In this final transaction, the Rileys borrowed money from First United Bank to purchase land on which they could build their home. Both the Rileys and First United wanted title insurance, and Blythe provided it.  She stated that she would verify identification of the parties at the settlement, but she verified only the buyers' identities, not the seller's (Gospel Church). Blythe was familiar with the property as this was one of the original nine parcels that VanSickle had deeded to Gospel Church in 2011 for $100 consideration as described above.

On the HUD-1, Blythe listed Gospel Church as the seller but provided no address for the Church.  The proceeds were paid over to Unity Mortgage and "Jacob Aiken" signed the release of the indemnity mortgage filed by Samuel VanSickle against the property.

**Admission of the Civil Land Fraud Complaint and Redacted Deposition**

Blythe began to represent VanSickle by at least 1998, when she represented him in a civil fraud case filed in the Circuit Court for Garrett County, Maryland.  The civil case alleged that VanSickle and his company Mutual Trust had defrauded grantees, the Currans, who purchased land from VanSickle in Garrett County.  On March 2, 1999, Blythe defended a deposition of

VanSickle in which he identified his address as P.O. Box 156, Accident, Maryland—an address which Blythe used for VanSickle and sometimes for "Donald Blunt". VanSickle testified in the deposition that he did not like to hold property in his own name because then the property tax records enabled anyone to see his land transactions. He also testified that he did a lot of land buying and selling and had bought or sold at least 20 parcels of land in the last three to four years. VanSickle did not identify himself as a real estate agent. VanSickle testified that the State of Maryland had sued him and Sisler Lumber Company within the past 10 years.

The defendant's representation of VanSickle in the civil litigation case was alleged in Count 1, Paragraph 3 of the Indictment. The representation in the civil case began in 1998, *before* the initiation of the conspiracy charged in the Indictment. The defendant moved pre-trial to strike Paragraph 3 of Count 1 of the Indictment, and also filed a motion in limine to exclude the evidence in the event the district court did not grant the motion to strike. ECF No. 21 and 22. The government opposed both motions, ECF Nos. 29, 30, and the district court denied the motion to strike. ECF No. 55. The district court reserved ruling on the admission of the evidence until the trial. ECF No. 55.

At trial, Blythe renewed her motion to exclude the civil complaint and the civil deposition as redacted, but the district court admitted the evidence. During the summary testimony of the case agent, the court agreed to consider a limiting instruction to be provided by the defense. The district court included the limiting instruction in its jury instructions, which read:

> The government has introduced evidence that the Defendant served as a lawyer for Samuel R. VanSickle in a lawsuit, *Curran versus VanSickle, and others* prior to the time frame that's covered by the Indictment. That evidence has been offered for the limited purpose of showing that Ms. Blythe was present when Mr. VanSickle made the statements in his deposition that have been provided to you. You are not to speculate about the outcome of that case.

16

III.   **ARGUMENT**

   A.  **Legal Standard**

Blythe has provided a laundry list of 25 claims for which she contends she did not receive

effective assistance of counsel.  She has not cited the Court to any cases which either in general

or in particular describe the standards the Court should apply in evaluating her 25 claims of

ineffective assistance.  The claims include trivial ones such as Claim 25 - date of the provision of

the Pre Sentence Report -- and petty claims such as Claim 22-- counsel in Blythe's opinion could

not operate the exhibit camera and display effectively.   The overall impression created by the

Petition is that the defendant is aggrieved by having been convicted and has gathered together

her grievances, large and small, and dumped them into a lengthy pleading. Defense counsel has

provided a lengthy affidavit, ECF 137, accompanied by exhibits, ECF 139, which demonstrate

that many of defendant's complaints are buyer's remorse - - tactical decisions which the

defendant endorsed at the pretrial and trial stage are now deemed wrong.  The review of trial

tactics by hindsight in light of the verdict is precisely how 2255 petition should **not** be evaluated.

*United States v. Dyess*, 730 F.3d 354, 361 (4th Cir. 2013).

To succeed on an ineffective assistance of counsel claim, a defendant must show: (1) that

her counsel's performance fell below an objective standard of reasonableness; and (2) that

counsel's deficient performance was prejudicial. *See Bobby v. Van Hook,* 558 U.S. 4, 7 (2009);

*Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Under the first prong of *Strickland*, a

defendant bears the burden to demonstrate that counsel's performance fell below an objective

standard of reasonableness under "prevailing professional norms."  *Strickland* at 688. In

evaluating counsel's performance, courts must "indulge a strong presumption that counsel's

conduct falls within the wide range of reasonable professional assistance." *Id.* at 689; *see United States v. Galloway*, 749 F.3d 238, 241 (4th Cir. 2014). Further, courts must not engage in hindsight; rather, they must evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors. *See Strickland at 690.*

To satisfy the second prong of *Strickland*, a defendant must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* However, a court cannot grant relief solely because the outcome would have been different absent counsel's deficient performance. *See Lockhart v. Fretwell*, 506 U.S. 364, 369-70 (1993). Instead, a court can only grant relief under the second prong of *Strickland* if the "result of the proceeding was fundamentally unfair or unreliable." *Id.* at 369.  The burden is on the Petitioner to establish not merely that counsel's errors created the possibility of prejudice, but rather "that they worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimension."  *Murray v. Carrier*, 477 U.S. 478, 494 (1986) (citations omitted, emphasis original). The two prongs of the Strickland test are "separate and distinct elements of an ineffective assistance claim," and a successful petition "must show both deficient performance and prejudice."  *Spencer v. Murray*, 18 F.3d 229, 233 (4th Cir. 1994) (emphasis added).  Therefore, a court need not review the reasonableness of counsel's performance if a petitioner fails to show prejudice.  *Quesinberry v. Taylore*, 162 F.3d 273, 278 (4th Cir. 1998).   An overall deficiency in the petition is the failure of the defendant to show how some piece of evidence would have changed the outcome when the defendant had every reason to know that VanSickle was Donald Blunt/Gospel Church or Donald Blunt/Freedom Church.

The government has grouped the defendant's claims of ineffectiveness into categories because of the overlap of the allegations and the similarity of the legal analysis.

B.  **Defense Counsel's Failure to Call Expert Witnesses - Claims 1, 2, 3, 4, 5, 7, 8, & 24**

Defendant/Petitioner has alleged that defense counsel failed to call expert witnesses on real estate transactions, the conduct and role of notaries public, "1031" tax exchanges, real property law, use of companies for privacy purposes, title insurance, bank negligence, and Maryland deeds, real property intake sheets and types of conveyances.  Grounds 1, 2, 3, 4, 5, 7, 8, & 24.   Defendant/Petitioner has stated that if an expert in "mail away closings" had been called, she would not have been convicted.  Petition at p. 8.  Defendant/Petitioner has failed to identify precisely what an expert witness for "mail away closings" would have said that would have exonerated her.

As defense counsel's Affidavit makes clear, defendant discussed with her attorneys the wisdom of calling expert witnesses on real estate closings and the duties of settlement officers. Counsel identified and consulted three possible experts on real estate closings.  ECF 137-1 at ¶¶3 - 10.  Defense counsel ultimately concluded that calling a defense expert "would have allowed the Government on cross-examination to highlight the serious shortcomings of Defendant's office practices," which would be "counterproductive."  *Id.* at ¶ 5.  *See United States v. Terry*, 366 F.3d 312, 317 (4th Cir. 2004) (noting that "the decision whether to call a defense witness is a strategic decision demanding the assessment and balancing of perceived benefits against perceived risks, and one to which we must afford enormous deference").  The Fourth Circuit has repeatedly held that which witness to call is a tactical decision left to counsel.  *United States v. Chapman*, 593 F.3d 365, 369 (4th Cir. 2010); *see  Bell v. Evatt*, 72 F.3d 421, 429 (4th Cir. 1995)

("Standing alone, unsuccessful trial tactics neither constitute prejudice nor definitively prove ineffective assistance of counsel.").

Defense counsel decided not to call an expert witness on notaries public and attorneys' reliance on them because "such testimony would have been very damaging to the Defendant" and "illustrate[ed] the inadequacy of Defendant's practices." *Id*. at ¶7.  Government counsel can attest that the Government had a copy of the "Handbook of Maryland Notaries Public", ECF 139 at pp. 42-80, and was prepared, as defense counsel foresaw, to cross-examine a notary expert or the defendant herself.  The defendant had personally notarized the signatures of two phony persons:  "Allen Helms" and "Jacob Aiken" in connection with the sale of "The Woodlands" for a purported purchase price of $4 million.  The sloppy practices of the defendant or those she supervised made Blythe's reliance on other notaries less believable:  why would Blythe rely on the identification by other notaries when her own seal meant nothing?

The defendant complains of the failure to call an expert on "1031 like kind exchanges"; the defendant today believes that such an expert would have been helpful.  Defense counsel consulted with an expert who identified numerous irregularities and decided that calling the expert would be "counterproductive."  ECF 137 at ¶ 8.   The irregularities aren't identified, but they must certainly include what the defendant now calls the Qualified Intermediary, Unity Mortgage.  A Qualified Intermediary cannot have an interest in the transaction, but VanSickle contributed collateral, his name was on the defendant's settlement file, and he was the only representative the defendant every dealt with for Unity Mortgage[2].  And even if Unity Mortgage had been a Qualified Intermediary, the settlement statement would still have been materially

---

[2] Evidence showed that Unity Mortgage's only existence was as a name on a VanSickle bank account.

false as the buyer's funds to close were not collected and the proceeds as shown on the HUD-1

were not paid out.  In any event, defense counsel weighed the risks and benefits and decided not

to call a like-kind exchange expert--a decision left to counsel.

The defendant complains of the failure to call an expert witness that BB&T was negligent

in making or underwriting the Red Run loan.  ECF 124  at pp. 16-21.   The BB&T witnesses

called by the government were the loan officer and his supervisor.   Defense counsel vigorously

cross-examined both witnesses and elicited testimony about incomplete information during

BBY&T's underwriting of the loan, the inexperience of the loan officer, and the results of

BB&T's own investigation into the failed Red Run loan.  Proof that BB&T was negligent or even

sloppy does not prove the defendant's innocence.  The settlement statement the defendant

provided to BB&T falsely summarized the financial transaction; the lender was justified in

relying upon the settlement officer to follow the settlement statement.  Moreover, Blythe billed

VanSickle for transferring Red Run from R&R Lakeside, his cousin's limited liability company,

to Gospel Church.  The cousin testified that VanSickle, in a closing handled by Blythe, supplied

the funds for the cousin to purchase Red Run.  The evidence supported the jury's conclusion that

Blythe knew that VanSickle was the real party in interest on the transaction.

The defendant re-argues in her memorandum a point previously rejected by the jury; the

defendant contended at trial that the timber was in lieu of the buyer's funds to close.  ECF 124-3

at 17.  However, BB&T internal records identified the timber as collateral and the fax

transmission from the bank loan officer to Blythe dated October 4, 2004 specifically identified

the timber and the bed and breakfast as collateral.  The Fourth Circuit has previously affirmed

the defendant's conviction; the defendant is attempting to re-argue her appeal under the guise of a 2255 petition.[3]

## C.  Defense Counsel Failed to Advise Defendant of Judge Quarles' Memorandum Opinion on Pre-Trial Motions which Renders Her Decision to Waive Her Right to Testify Invalid- Claims 6 & 21

The defendant has argued that she did not see the Court's memorandum opinion regarding motions and was therefore unaware that her intent was the central issue in the trial.  ECF 124-3 at p. 13-14.  Defense counsel has stated that the opinion was available to the defendant.  ECF 137 at ¶11.  Defendant's assertion that she was unaware that her intent was the main issue is not credible. *Id.*  The defendant conducted seven settlements for a fictitious trustee and fictitious church; the only issue was whether she was duped by VanSickle or complicit in his conduct. That her intent was the central issue in the case should have been apparent to the defendant as a lawyer, but it was spelled out for her by her attorneys.   Defense counsel stated that "the consensus of [defense counsel] and Defendant [was] that the best way to attack the Government's case was to show that, despite the fact that the Defendant handled the transactions set forth in the indictment, she did not possess the requisite knowledge and intent necessary to sustain a conviction."  ECF 137 at ¶ 2.  In defense counsel's letter to the defendant in July 2015, counsel reviewed for the defendant the elements of the offenses with which she was charged, including the *mens rea*.  ECF 139 at p. 28-34.  Defense counsel shared a draft of his opening statement with the defendant on September 26, 2015, in which he stated:

> And you will see that she did in fact witness signatures and execute documents involving persons and entities that the government says are fictitious.
> But it is not that easy.
> Because the heart of this case is whether Angela Blythe knew that the persons and business were fake when she executed the documents.

---

[3] The defendant also faults defense counsel for not obtaining the BB&T loan file; the BB&T loan file and internal loan failure investigative file were both provided to the defendant in discovery.

ECF 139 at 17.  Later in the same draft, defense counsel stated,

> So did Sam VanSickle fool or take advantage of Angela Blythe or did Angela make a deal with the devil and agree with VanSickle to knowingly defraud banks of millions for which she received next to nothing?
> THAT is the question.

*Id.*

The Court need not resolve the issue whether the defendant knew her intent was the central issue of the case or whether she had read the Court's memorandum opinion.  In the context of providing legal advice about the right to testify, the Fourth Circuit has made clear that "'all the defendant needs to know is that a right to testify exists,' and the district court need not advise the defendant nor obtain a waiver." *United States v. Sharp*, 400 Fed. Appx. 741, 748-49 (4th Cir. 2010) (q*uoting United States v. McMeans*, 927 F.2d 162, 163 (4th Cir. 1991)).  Pursuant to these precedents, a defense counsel satisfies any Sixth Amendment requirement simply by ensuring the defendant knows of her right to testify or not.

The Defendant was well aware of her right to testify.  First, she herself was an attorney.  Second, whether or not she should take the stand was the subject of frequent discussion among counsel and the Defendant.  ECF 137 at ¶¶11-13; ECF 139 at pp. 81-83.  Finally, defense counsel had prepared an extensive outline of her testimony.  ECF 139 at pp. 84-122.   Defense counsel was ready to proceed if Blythe exercised her right to testify.  Counsel's advice to her regarding the dangers of cross examination, especially in light of her failed polygraph and poor performance in trial preparation, ECF 137 at ¶¶ 12-13, was objectively reasonable, but counsel's willingness to follow the defendant's instructions if she chose to testify was clear from the extensive outline of her testimony.  Courts have been particularly loath to find prejudice where a defendant makes a strategic or tactical decision at trial, especially the determination not to testify.  *Hutchins v. Garrison*, 724 F.2d 1425, 1436 (4th Cir. 1983) ("Counsel's advice not to

testify is a paradigm of the type of tactical decision that cannot be challenged as evidence of ineffective assistance.").  Based on the foregoing, the Defendant cannot claim that she received objectively unreasonable representation in this matter.

At the critical time, the defendant elected not to testify.  She now regrets that decision because the jury convicted her and would like a "do over."  But she made the decision fully informed of her rights and fully aware of what was at stake.  Defense counsel had prepared her direct and had done a mock direct and a mock cross examination with her. ECF 137 at ¶ 13. Because the choice ultimately did not work out does not mean that defense counsel's advice was constitutionally defective or that the defendant should now have a second bite at the apple.

D.  **Claims Regarding Failure to Call Specific Witnesses - Claims 15, 16 & 20**

The defendant claims that she received constitutionally defective representation because her attorney failed to call a Wendy Herron, a notary public who had notarized some of VanSickle's "aliases", failed to cross-examine Summer Rhodes, a notary public called by the government and failed to call Samuel VanSickle.  Summer Rhodes was a former employee of Louis Strosnider who testified that she notarized documents when directed to do so by Strosnider without verifying the identity of the signer or even having the signer in her presence.   The decision whether to permit Ms. Rhodes' admissions to constitute her testimony or to present every single false notary to her is a strategic decision for the defense attorney to make.  Defense counsel has explained his reasons for excusing her, ECF 137 at ¶ 22, and this decision is not constitutionally defective. Ms. Rhodes was plainly upset during her direct examination; the trial court offered her both Kleenexes and water.  T-IV-780.  Moreover, the defendant cannot demonstrate prejudice from counsel's decision to rely upon Ms. Rhodes' over all admission on direct examination that she often notarized documents at Strosnider's and VanSickle's direction

24

rather than eliciting the false notary admissions signature by signature.  The more extensive testimony would have been at best cumulative.  The defendant herself notarized documents for VanSickle's aliases, Allen Helms and Jacob Aiken, so the jury was well within its province as factfinder to conclude that the defendant knew the risk of relying upon notaries in VanSickle's transactions.

The defendant also complains of the failure to call VanSickle as a witness.  Charges were then pending against VanSickle, and defense counsel communicated with VanSickle's lawyer, who refused to permit defense counsel to interview VanSickle. ECF 137 at ¶ 23. VanSickle had a valid Fifth Amendment privilege which his able attorney would have counseled him to exercise.

The defendant also complains that counsel's work was defective for failing to offer a letter from VanSickle to her into evidence. The letter was hearsay and inadmissible.   An attorney does not make a mistake by failing to offer inadmissible evidence.    As the Fifth Circuit has observed, "the failure to make a meritless attempt at introducing evidence could not have prejudiced [the petitioner] because the evidence ultimately would not have been introduced." *Garza v. Stephens*, 738 F.3d 669, 677 (5th Cir. 2013); *see also Hoots v. Allsbrook*, 785 F.2d 1214, 1222 (4th Cir. 1985) (holding that trial counsel's "decision not to attempt to introduce inadmissible evidence . . . did not constitute ineffective assistance of counsel").

### E.  **Failure To Argue Or Admit Evidence That Robeson Conducted The Riley Closing - Claim 11**

Defendant today wants to prove that she was out of the country when the Tracy Riley closing occurred.  She now regrets the decision not to elicit from John Robeson that he conducted that closing.  ECF 124-3 at 25-26.  Defense counsel chose not to introduce that testimony because the defendant supervised that closing.  ECF 137 at ¶ 18 and ECF 139 at p. 124-25.  As defense counsel explains, eliciting Robeson's testimony that the defendant was out

of the country at closing would have undermined the defense that Blythe relied on notaries because Robeson notarized a signature for someone not present. Moreover, Blythe should not have asked Robeson to conduct a closing without her as he lacked the proper authorization to do closings.  T-III-624.  The defendant had already been shown to have cut corners on VanSickle's behalf as she had notarized releases for Jacob Aiken and Allen Helms, two non-existent people. Defense counsel had to determine whether showing defendant as someone who cut corners for VanSickle was a good idea.  This strategic decision cannot be said to have produced a different outcome even as to the Tracy Riley count.

F.  **Defense Counsel's Comments And Behavior Prejudiced The Defendant - Claims 12 & 22**

The defendant claims that defense counsel's behavior during the trial prejudiced her and she identifies two instances.  Defense counsel has stated their belief that they comported themselves in a professional manner at all times.  ECF 137 at ¶ 19.  She identifies a defense counsel "blurt" in front of the jury which revealed that defendant would lose her law license and go to jail, if convicted.  The government believes that this "blurt" was an orchestrated attempt by counsel to put inadmissible considerations before the jury to elicit sympathy for the defendant. Whether the blurt was deliberate or accidental, the defendant suffered no prejudice as a result. Similarly, the courtroom comedy was intended to make the jury laugh and lighten the trial.  The defendant suffered no prejudice.

G. **Defense Counsel Was Unprepared To Cross Examine Key Witnesses Specifically Greg Johnson And Jeff Mccauley - Claims 13, 17**

Defendant complains of the cross-examination of these two bank loan officers, but she does not identify what evidence defense counsel should have elicited which would have exonerated her.  ECF 124-3 at pp. 27, 33-34.  The fact that McCauley notarized a signature of VanSickle personally some years after the transactions charged in the indictment proves nothing

about defendant's state of mind.  The fact that Mr. Norman was nervous prior to his cross

examination of Gregg Johnson does not demonstrate that his cross was ineffective; many trial

lawyers are nervous before the direct or cross of significant witnesses.

H.  **Defense Counsel Did Not Ask For The Witnesses To Be Sequestered.  Claim 14**

The defendant complains that defense counsel did not ask for witnesses to be sequestered

but identifies only FBI Special Agent Umlauf as a witness present in the courtroom.

Government counsel believes that the witnesses were sequestered whether by custom or court

order.  As defense counsel points out, SA Umlauf was authorized by rule to be present.  ECF 13

at ¶21.

Claim 14 also contains the grab bag of claims that defense counsel failed to subpoena the

bank's closing files and did not file a motion for new trial or judgment notwithstanding the

verdict.  The government had subpoenaed the victim banks for various loan files and supplied

those in discovery.  The government cannot locate a case on ineffective assistance when a

defendant did not request that a motion for new trial or judgment notwithstanding the verdict be

filed, and the defendant does not cite one either.

I.  <u>**Defense Counsel Did Not Conduct The Defense Well --Claims 18, 19, 20 & 23**</u>

The defense had searched the land records of Garrett County to locate every deed

involving VanSickle alter egos--aliases such as Gospel Church, Freedom Church, Donald Blunt,

Allen Helms, Jacob Aiken and others--to show that many such deeds were prepared by attorneys

other than Blythe.  These deeds were introduced by defendant's paralegal.  Defense counsel

interviewed Garrett County attorneys Linda Sherbin and Craig Ingram.  ECF 137 at ¶ 27.  But

the defense team decided not to call them as witnesses because Ms. Sherbin was hostile and

Craig Ingram's testimony was problematic.  ECF 139 at 140-141.  What is apparent is that

counsel was prepared, had interviewed the witnesses, reviewed their statements and/or deposition testimony and carefully weighed the pluses and minuses.  Ultimately, the defense called a notary named Moreland and a more recent client of Blythe's who testified that she was meticulous in everything she did.  In addition, the defense elicited positive testimony about Blythe from her paralegal, Kim Durst, and from her former associate John Robeson.  The decisions of which witnesses to call are uniquely within the purview of defense counsel. *United States v. Chapman*, 593 F.3d 365, 369 (4th Cir. 2010); *see Bell v. Evatt*, 72 F.3d 421, 429 (4th Cir. 1995) ("Standing alone, unsuccessful trial tactics neither constitute prejudice nor definitively prove ineffective assistance of counsel.").   Moreover, Blythe does not identify what these witnesses would have testified to that would have exonerated her.  Even if each said, "I trusted VanSickle," it would not mean that if they knew as much as Blythe, they would have continued to trust him.  In particular, Ingram had told the government that VanSickle appeared to him to be operating through Gospel Church after he saw the deed from April 2001, in which VanSickle gathered together nine parcels of land that he owned and transferred all of them for $100 consideration to Gospel Church (described above in connection with the Old Morgantown Road transaction).

 J.  **There Was No Prosecutorial Misconduct**.

The prosecutor produced all the bank loan files that had been obtained during the investigation.  No bank records were withheld.

The defendant alleges that "the prosecutor permitted Jeffrey McCauley to tell the judge and the jury Summer Rhodes was Defendant's employee." ECF 124-3 at 45.  In fact, Mr. McCauley testified on direct:

Q:  Do you know who Summer Rhodes is?
A: I've met her. I can't -- I think she was an employee of Ms. Blythe.

Q:  Is that correct?
A:  I believe. I don't know for sure. I --I've seen that name.  I don't know."

T-II-293.   Although Mr. McCauley stumbled in his answer, the net effect was "I don't know."

On cross examination, Mr. White asked Mr. McCauley,

Q:  And the name Summer Rhodes, Ms. McDonald asked you some questions about her.  She worked for Lou Strosnider, didn't she?
A: You know, I don't know.  Again, I've seen that name.  I don't know that person.

T-II-305.

At the conclusion of Mr. McCauley's direct and cross examination, the jury could fairly conclude that Mr. McCauley didn't know Summer Rhodes or where she worked but he had seen the name.  In case there was any confusion, the government called Summer Rhodes, now Spiker, as a witness; she testified that she worked for Louis Strosnider at Stony Brook Development.  T-IV-774.  There was no prosecutorial misconduct regarding Summer Rhodes' employment.

Blythe has attempted in her petition to re-argue the Red Run transaction; the jury reached its own conclusions regarding that transaction when it convicted the defendant of both bank fraud of BB&T and making a false statement to BB&T.  Blythe mischaracterizes the government's questions to BB&T officials as misleading; Blythe is attempting to argue in her 2255 petition that Red Run was a 1031 exchange because the sales contract referred to a tax free exchange.  Nothing in Blythe's settlement file suggested that Unity Mortgage was a Qualified Intermediary or that Blythe as the settlement agent had ever spoken or otherwise been in contact with a representative of a Qualified Intermediary.  Unity Mortgage could not be the Qualified Intermediary because VanSickle was its only representative, and as a party to the Red Run transaction, his Unity Mortgage could not serve as a Qualified Intermediary.  The government's questions and argument were focused on the irregularities of the supposed tax free exchange--

irregularities which were evidently observed by the expert consulted by defense counsel.  ECF 137 at ¶ 8.

Blythe also ignores the evidence of the transaction immediately following Red Run. VanSickle directed Blythe to handle the Schamburg's purchase exactly as she had handled Red Run and to pay the proceeds due Gospel Church to Unity Mortgage. Like Red Run, there was no mortgage on the Schamburg's purchase property.   One of the government's trial exhibits was a telephone message with post it notes from the Shamburg's settlement file:



Blue Goose 000002

VanSickle's name and instructions are all over the Schamburg file--directing Blythe to handle the net proceeds by issuing the check to Unity Mortgage "same as Strosnider from Gospel Church." And on December 6th, "left vm [voice mail] for Sam V. to pick up check."   This is the same property about which Blythe wrote in an email:

From:   Angela Blythe <angelablythe@verizon.net>
Subject:   **New title request**
Date:   October 13, 2004 12:31:40 PM EDT
To:   j_slaubaugh@yahoo.com

Jill:

Sam has a piece of property he is selling that is currently titled to Gospel Church (Deed Book 875, page 695) here in Garrett County.

Closing is to occur within next two weeks.  Can you please do title.

Thanks,
Angela

The jury could fairly conclude that Blythe's own words are the literal truth-- that Sam **has** a piece of property he is selling that is currently titled to Gospel Church.  Once the jury concluded that Blythe knew that properties titled to Gospel Church were really Sam's, the jury could conclude that Blythe knew that Gospel Church was simply a VanSickle alter ego.  Blythe conspired with VanSickle to conceal his ownership from the lenders attempting to underwrite their loans in his deals and on Red Run, concealed the fact that she had not collected the necessary closing funds from Strosnider.  Whether government counsel inverted the 3 and 4 in stating the amount the defendant failed to collect doesn't matter; the defendant failed to collect hundreds of thousands of dollars--a material amount.

## <u>Conclusion</u>

Defense counsel spent months in reviewing records, interviewing witnesses, searching for experts, writing and arguing pre-trial motions, and preparing for trial.  Defense counsel put on a spirited defense.  Blythe's complaints are Monday-morning quarterbacking; as defense counsel's affidavit shows, Blythe was included in the defense decision-making and concurred in it.  She became unhappy only when the defense did not carry the day.  Not only did Blythe receive representation within the Sixth Amendment standard, she received far better.  The government asks that the Court deny the petition.

Respectfully submitted,

Stephen M. Schenning
Acting United States Attorney

By   _____/s/_____
Joyce K. McDonald
Assistant United States Attorney

## **Certificate of Service**

I certify that the foregoing Response to Defendant's Petition was served by filing on the Court's electronic filing system and by first class United States mail to Angela Blythe, 3 South Third Street, Oakland, MD 21550.

_____/s/_____
Joyce K. McDonald